1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DARRAN GRANT,                        No.  2:11-cv-2302 KJM KJN P

12              Plaintiff,

13        v.                              ORDER and AMENDED FINDINGS AND
                                          RECOMMENDATIONS
14   S. PALOMARES, [1]

15              Defendant.

16

17        Plaintiff is a state prisoner proceeding without counsel.  This civil rights action is

18   proceeding on the complaint filed August 30, 2011.  By order and findings and recommendations

19   issued January 8, 2014, plaintiff's motion for discovery was denied, and the undersigned

20   recommended that defendant Palomares' motion for summary judgment be granted.  However, on

21   January 7, 2014, plaintiff's response to the court's December 10, 2013 order was entered on the

22   court's electronic docket.  (ECF No. 41.)  Plaintiff's filing was signed on December 31, 2013, and

23   an accompanying letter to the Clerk was dated December 31, 2013. [2]  (ECF No. 41 at 5-6.)  Under

24   the mailbox rule, plaintiff's submission was timely-filed and must be considered in connection

---

[1]  Defendant Knipp was dismissed by order filed November 23, 2011.  (ECF No. 11.)

[2]  The proof of service appended to plaintiff's filing was dated December 13, 2013.  (ECF No. 41 at 7.)  However, inasmuch as plaintiff's response was to a court order issued December 10, 2013, it is unlikely that plaintiff's response to such order was presented to prison authorities for mailing on December 13, 2013.

1  with defendant's motion for summary judgment.  See Houston v. Lack, 487 U.S. 266, 275-76

2  (1988) (pro se prisoner filing is dated from the date prisoner delivers it to prison authorities).

3  Accordingly, the January 8, 2014 findings and recommendations are vacated, and the court will

4  consider plaintiff's response in issuing amended findings and recommendations herein.

5        On January 27, 2014, plaintiff filed an application for an extension of time to file

6  objections to the findings and recommendations.  (ECF No. 43.)  Because the January 8, 2014

7  findings and recommendations are vacated, plaintiff's application is now moot and is denied.

8  Plaintiff's Complaint

9        In plaintiff's verified complaint, plaintiff alleges the following:  Late at night on June 18,

10  2010, in Building 11 at Mule Creek State Prison ("MCSP"), several inmates overdosed on

11  suspected narcotics, causing the death of one inmate.  (ECF No. 1 at 5.)  As a result, all inmates in

12  Building 11 were evacuated in segments.  During the evacuation, plaintiff was stopped and

13  questioned concerning the incident, and then he was taken to the basketball court along with

14  several dozen inmates.  (ECF No. 1 at 5.)

15        At some point early in the morning of June 19, 2010, plaintiff became involved in a verbal

16  argument[3] with defendant Palomares.  (ECT No. 1 at 6.)  Subsequently, defendant ordered

17  plaintiff to lay on his stomach, or "prone out."  Plaintiff alleges he told defendant that plaintiff has

18  a heart defibrillator and tried to explain that plaintiff could not prone out because of the pressure

19  it would place on plaintiff's heart.  Plaintiff claims that defendant Palomares used excessive force

20  on plaintiff by "body slamming plaintiff to the pavement face down, causing facial scraping and

21  bruising, along with the damage caused to the heart device implanted in plaintiff's chest, causing

22  the terminals to dislodge from the device."  (ECF No. 1 at 8.)

23        Plaintiff states that defendant's action caused plaintiff great pain from June 19, 2010, to

24  the present.  (Id.)  Plaintiff seeks damages, and declaratory and injunctive relief.  (Id. at 3, 8-9.)

25

26  [3]  Plaintiff claims that at the rules violation hearing, plaintiff stated:  "He, Officer Palomares, didn't tell me to keep quiet, he told me to shut the fuck. up.  So I told him to shut the fuck up.  We

27  did have an argument go on."  (ECF No. 1 at 6.)  Plaintiff was subsequently found guilty of refusing a direct order resulting in the use of force.  (ECF No. 1 at 32, citing Rules Violation

28  Report Log #C-06-10-073, dated June 19, 2010; 40-46.)

1    Handcuff Timing

2           In his deposition, plaintiff claimed that defendant Palomares cuffed plaintiff's hands prior

3    to the use of force.  (Pl.'s Depo. at 17:19-21; 20:7-8; 22:13-24.)  The court ordered the parties to

4    brief plaintiff's statement.  (ECF No. 39.)  Defendant filed a response on December 17, 2013.

5    (ECF No. 40.)  On January 6, 2014, plaintiff filed a response.[4]  After review of the record and the

6    briefing, the court finds a material dispute of fact as to whether plaintiff was handcuffed prior to

7    or after defendant's use of force, as explained more fully below.

8           Defendant's Response

9           Defendant points out that in plaintiff's opposition (ECF No. 37 at 1), plaintiff stated that

10   he did not dispute the following facts:  Officer Palomares gave Grant a direct order, approached

11   Grant, placed his hands on Grant's elbow and shoulder, brought Grant to the ground, ordered

12   Grant to place his hands behind his back, and after Grant complied, Officer Palomares applied

13   handcuffs.  (Def.'s UDF 13, 15, 17, 19.)  Defendant states that these facts are consistent with

14   plaintiff's verified complaint, Lt. Williams' contemporaneous report of the incident, Officer

15   Palomares' report of the incident, the Rules Violation Report, the questions plaintiff asked during

16   the rules violation hearing, and Officer Palomares' sworn testimony.

17          Defendant argues that because these facts were undisputed by plaintiff in his opposition to

18   the motion, and plaintiff failed to identify evidence contradicting these facts, the court should

19   disregard plaintiff's allegedly inconsistent deposition testimony because it is not the court's role

20   to search for evidence to challenge the parties' mutual assertion of undisputed facts.  (ECF No. 40

21   at 2-3.)  In addition, defendant argues that plaintiff's deposition testimony was internally

22   inconsistent because of his testimony about being brought to the ground (Pl.'s Depo at 41:21-

23

24   [4]  In his response, plaintiff argues that no force was necessary, and that defendant was "acting
     'maliciously and sadistically to cause harm.'"  (ECF No. 41 at 2-3.)  However, further briefing
25   was ordered solely on the issue of plaintiff's deposition testimony concerning the timing of the
     handcuffing.  (ECF No. 39 at 2.)  Thus, the court disregards plaintiff's additional arguments.
26   Moreover, any claim that force was not necessary implicates the guilty finding from the July 23,
27   2010 prison disciplinary, and is barred under Heck v. Humphrey, 512 U.S. 477 (1994).  On
     September 6, 2012, defendant's motion to dismiss was granted as to any challenge to the validity
28   of the guilty finding resulting from the July 23, 2010 prison disciplinary.  (ECF No. 24 at 2-5.)

42:15), and plaintiff read into evidence defendant's report stating that he placed handcuffs on

plaintiff after the use of force.  (Pl.'s Depo. at 26-3-6.)  Defendant argues that plaintiff's

deposition statement is undermined by other credible evidence, specifically, plaintiff's questions

posed to defendant during the rules violation hearing, "Did I tell you I couldn't lay on my

stomach?" and "Why didn't you just tell me to put my hands on my head to cuff me up?," are

consistent with Officer Palomares bringing plaintiff to the ground and then applying handcuffs.

(ECF No. 40 at 4, quoting ECF No. 1 at 6.)  Finally, defendant contends that plaintiff has

repeatedly adopted Officer Palomares' statement that he brought plaintiff to the ground and then

applied handcuffs:  (1) plaintiff attached the rules violation report containing defendant's report

of the incident to the complaint (ECF No. 1 at 40-41); and (2) plaintiff quoted from defendant's

report in an inmate appeal, also appended to the complaint (ECF No. 1 at 28, 40-41).  Defendant

argues that because plaintiff adopted defendant's statements in his complaint, they are a part of

the verified complaint for all purposes, and the court may disregard plaintiff's inconsistent

statement when contradicted by the complaint's attached exhibits.  (ECF No. 40 at 4.)

     <u>Plaintiff's Response</u>

     In his unverified response, plaintiff contends that his inmate assistant erroneously placed

defendant's undisputed fact number 19[5] under "undisputed facts" instead of "disputed" facts.

(ECF No. 41 at 2.)  Plaintiff claims the inmate assistant overlooked some pages in plaintiff's

January 10, 2013 deposition, such as:

     "After he cuffed me up, he slammed me on the ground after I was sitting down."  (ECF

No. 41 at 2, citing Pl.'s Depo. at 17:20-21.)

     "I was sitting Indian style in the middle of the basketball court and from there he cuffed

me up and slammed me on the ground."  (ECF No. 41 at 2, citing Pl.'s Depo. at 22:17-20.)

     Plaintiff argues that the declarations of plaintiff and defendant are "squarely

contradictory," and constitute material disputes of fact precluding summary judgment.  (ECF No.

---

[5]  Defendant's UDF 19 states:  "Once on the ground, Officer Palomares ordered Grant to place his hands behind his back.  Grant complied and Officer Palomares applied handcuffs."  (ECF No. 30-3 at 3.)

4

41 at 3.)  Finally, plaintiff states that two video cameras recorded the incident, and that these videotapes, currently in the possession of the California Department of Corrections and Rehabilitation ("CDCR"), "will verify plaintiff's account of events and will disprove defendant's theory."  (ECF No. 41 at 4.)

Discussion

First, on a motion for summary judgment, it is inappropriate for the court to weigh evidence or resolve competing inferences.  "In ruling on a motion for summary judgment, the court must leave '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts' to the jury."  Foster v. Metropolitan Life Ins. Co., 243 Fed. Appx. 208, 210 (9th Cir. 2007), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In addition, there is no "prohibition against considering all affidavits that are self-serving."  Jones v. Tozzi, 2007 WL 433116 at *12 (E.D. Cal. 2007) (explaining that the Ninth Circuit "merely permits a court to disregard self-serving affidavits which are contradicted by the plaintiff's own prior statements and other forms of undisputed evidence.").  Finally, an omission of a fact is not the same as the contradiction of a fact.

Defendant contends plaintiff's deposition testimony is internally inconsistent and therefore may be disregarded.  However, the court does not find that plaintiff's deposition testimony is clearly inconsistent, as explained below, and while plaintiff has consistently failed to mention the timing of the handcuffs as an issue in this action, the court finds that the record reflects competing inferences surrounding the placement of the handcuffs, as set forth below, such that the court must find the handcuff timing to be disputed.

In his verified complaint, plaintiff does not specifically address the issue of handcuffs while setting forth the facts underlying his excessive force claim.  (ECF No. 1 at 2-3.)  However, plaintiff states that during the hearing on the related rules violation report, he asked defendant the following questions, and elicited the following responses:

> Q.  I was sitting down.  Why did you slam me so hard that some of my skin scraped off my face?
>
> A.  I utilized the force necessary to gain compliance with my lawful order.

Q.  Did I resist?

A.  You would not comply with my orders.  I ordered you several time[s] to prone out.  I was trying to continue with the investigation into the inmate death in your building.  I would've rather not had to spend all my time trying to deal with all this other stuff.

Q.  Why didn't you just tell me to put my hands on my head to cuff me up?

A.  I utilized the authorized cuffing techniques that I believed would best insure my safety.

(ECF No. 1 at 6.)  The order in which plaintiff posed these questions to defendant, as well as the content of his question, "[w]hy didn't you just tell me to put my hands on my head *to cuff me up*?" could raise an inference that defendant cuffed plaintiff up after the use of force.  Such an inference is supported by plaintiff's failure to allege the use of excessive force <u>after</u> plaintiff was handcuffed.  Plaintiff did not claim that he was handcuffed prior to the use of force in his statement contained in the rules violation report (ECF No. 1 at 43), any of his administrative appeals (ECF No. 1 at 11-39),[6] his verified complaint (ECF No. 1), or in his oppositions to defendant's motion to dismiss (ECF No. 20), and the instant motion for summary judgment (ECF No. 37).  Although plaintiff now characterizes his failure to include the placement of the handcuffs as a disputed fact in opposition to the instant motion as an error on the part of his inmate assistant, the omission of the handcuffing issue from the opposition is supported by its omission from all of plaintiff's prior documents, including his verified complaint.

In addition, during the deposition, defense counsel attempted to clarify plaintiff's position:

Q.  So you were cuffed before you were brought to the ground?

A.  Yes, I was.  It's stated -- as a matter of fact, that's stated in the report also.

(Pl.'s Depo. at 22:21-23.)

---

[6]  For example, in the appeal response setting forth the details of plaintiff's appeal interview, plaintiff's focus was on plaintiff's defibrillator, and his allegation that defendant used physical force to place plaintiff in a prone position despite knowing plaintiff had a defibrillator.  (ECF No. 1 at 23.)  Plaintiff does not mention the timing of handcuffs in his declaration submitted in support of his administrative appeal, despite including specific details of the incident.  (ECF No. 1 at 25.)

1   Plaintiff did not submit this alleged report with his opposition to the motion or in response

2   to the court's further briefing order.  In addition, neither the incident report nor the rules violation

3   report state that plaintiff was handcuffed prior to defendant's use of force.

4   Moreover, in addition to defendant's declaration that he handcuffed plaintiff after the use

5   of force, Lt. Williams noted in his incident report that defendant used physical force to place

6   plaintiff "in a prone position on the ground and apply handcuffs."  (ECF No. 1 at 47.)

7   Nevertheless, in his deposition, plaintiff also testified that defendant was standing when

8   he applied the handcuffs.  (Pl.'s Depo. at 42-43.)  Such testimony could raise an inference that the

9   handcuffs were applied before plaintiff was taken to the ground, which supports plaintiff's prior

10  deposition testimony that the handcuffs were applied before the use of force.  (Pl.'s Depo. at

11  17:20-21; 20:7-8; 22:17-23.)  In his response to the further briefing order, plaintiff did not provide

12  a declaration confirming that defendant handcuffed plaintiff prior to the use of force; however,

13  plaintiff's deposition statements to that effect were made under penalty of perjury.

14  Defendant also contends that plaintiff adopted defendant's version of the facts when

15  describing, during the deposition, the facts surrounding plaintiff being taken to the ground.  (ECF

16  No. 40 at 2, citing Pl.'s Depo. at 41:21-42:15.)  However, after testifying that defendant was

17  behind plaintiff when defendant brought plaintiff down, plaintiff testified:

18  Q.  And he brought you down using his hands and brought you to
19  the ground?

20  A.  His hands, he used his hands because he cuffed me and he used
    his knee also for force to put his knee to grab my arms and helped
21  me up.

22  Q.  So he brought you up -- as he brought you to the ground, he
    used his knee on the back, in the small of your back?

23  A.  I believe that he used his knee.  When he cuffed me, if he used
    it past then, I can't recall that, I'm not really sure. . . .
24

25  (Pl.'s Depo. at 42:11-20.)  While a juror could read this testimony as described by defendant, the

26  testimony could also be understood to describe how defendant cuffed plaintiff with his hands,

27  then pushed plaintiff down with his hands, held him down with his knee, and helped him back up.

28  Plaintiff's responses regarding defendant's use of his hands and knee do not make clear when

1    plaintiff was cuffed.  In any event, this testimony is not clearly contrary to plaintiff's prior

2    deposition testimony, and the court declines to find it represents an inconsistent statement within

3    the deposition.

4          Although a videotape of the incident might clarify at what point plaintiff was handcuffed,

5    neither party submitted such videotape, and it is unclear whether such videotape exists.[7]

6          Moreover, defendant did not submit a declaration by Lt. Williams confirming that he

7    witnessed the June 19, 2010 incident, or saw defendant handcuff plaintiff prior to the use of force,

8    or describing where he was located in relation to plaintiff and defendant.  Thus, there is no

9    evidence from a disinterested witness attesting to whether the handcuffs were placed on plaintiff

10   prior to the use of force, or after.

11         Thus, the only competent evidence on the issue of handcuffing is defendant's declaration

12   that he handcuffed plaintiff after the use of force, and plaintiff's deposition testimony that

13   defendant handcuffed plaintiff prior to the use of force (with plaintiff's inconsistent positions

14   noted above).

15         Based on this record, the question of whether or not plaintiff was handcuffed at the time

16   defendant used force is a dispute of fact.  Plaintiff's sworn deposition testimony is not clearly

17   contradicted by his own prior testimony or by undisputed evidence, and the court may not resolve

18   competing inferences or weigh evidence on a motion for summary judgment.

19         Second, the court declines to find that plaintiff adopted defendant's statement concerning

20   the incident simply because plaintiff appended the incident report and rules violation report to the

21   complaint.  See Scanlan v. Sisto, 2012 WL 1130668, *2-3 (E.D. Cal. March 28, 2012).[8]  "The

22

23   [7]  The incident report notes that during the video interview of plaintiff on June 19, 2010, the
     battery died, and after the battery was replaced, plaintiff declined to proceed with the video
24   interview.  (ECF No. 1 at 56.)  The camera operator concluded the interview and then "went to
     ISU office to process the 1 video cassette and 1 digital photo into ISU evidence locker #2."  (Id.)
25

26   [8]  In Scanlan, the district court discussed the evaluation and use of exhibits appended to the
     complaint under Rule 10(c) of the Federal Rules of Civil Procedure, and distinguished how "the
27   court may reject what the plaintiff *says* about the report," but "the court cannot summarily reject
     plaintiff's allegations that in fact the prison authorities took no action, regardless of what the
28   incident report says."  Scanlan, at *3.

1   fact that plaintiff has attached to his complaint documents showing prison officials found

2   defendant's use of force was justified does not mean plaintiff has adopted as true all of the

3   statements in those documents, where it is clear from the allegations in the complaint that he

4   contests such findings."  Furnace v. Sullivan, 2008 WL 4856826 (N.D. Cal. Nov. 10, 2008),

5   citing Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 674 (2d Cir. 1995) (holding Rule 10(c) of

6   Federal Rules of Civil Procedure, providing that "an exhibit to a pleading is a part of the pleading

7   for all purposes," does not require plaintiff to adopt as true full contents of documents attached to

8   complaint).  Whether or not plaintiff raised the issue of the placement of the handcuffs, plaintiff

9   makes clear in his verified complaint that he does not agree with defendant's version of the facts:

10  "Officer S. Palomares did not testify truthfully at my Disciplinary Hearing held on August 3,

11  2010."  (ECF No. 1 at 7.)

12          Third, the court declines to find that plaintiff adopted defendant's statement based on

13  plaintiff reading into evidence the defendant's report.  In response to defense counsel's question

14  whether an officer is within his right to bring an inmate to the ground if the inmate is ordered to

15  prone out but refuses that order, plaintiff responded with a page and a half narrative, that included

16  the following pertinent testimony:

17              . . . I don't know what he was going through, I don't know what
              was going on in his head, I can't explain that.  But when you come
18              back to asking me how he cuffed me up, I can state that to you, how
              he threw me to the ground.  I can read it to you right now what was
19              said or how it supposedly happened.  I told you my version but I
              could tell you that it says right here he instructed me "to prone out
20              with negative results then applied physical force by pulling Grant's
              left hand and pushing his upper torso counterclockwise from his
21              seated position to a prone position" which makes no sense.  "As I
              placed Grant on the ground, I heard what appeared to be his head
22              hitting the ground.  I ordered Grant to put both his hands on his
              back when he complied.  I placed handcuffs . . . on Grant and
23              assisted him to his feet.  I then called" -- he called the sergeant or
              whatever, but none of that even made sense because --
24
              Q.  Mr. Grant, that has already been introduced into the record so
25            we don't need to go through it word-for-word. . . .

26  (Pl.'s Depo. at 25-26.)  In this context, as well as the fact that plaintiff was interrupted before he

27  could finish, or could identify what he meant by "none of that even made sense," the court cannot

28  view plaintiff's narrative as adopting defendant's statement of the incident as true.  Again,

9

1    defendant could argue that portions of plaintiff's testimony raise an inference that plaintiff was

2    cuffed after defendant took plaintiff to the ground.  But that argument is insufficient here.

3         Fourth, the court acknowledges that it is not required "to scour the record in search of a

4    genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996); see also

5    Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  However,

6    these cases are inapposite.  In Keenan, the almost three volumes of pertinent evidence submitted

7    on appeal were not paginated or organized, and were characterized by the Ninth Circuit as

8    "virtually impenetrable."  Keenan, 91 F.3d at 1278-79.  In Carmen, the retaliation admission

9    submitted on appeal was buried in "six heavily stuffed folders of papers, eight or nine inches

10   thick when pressed together," in a declaration filed two years prior to the motion for summary

11   judgment.  See Carmen, 237 F.3d at 1029.  Here, plaintiff's statements concerning the timing of

12   the handcuffing were in his 65 page deposition filed in connection with the motion for summary

13   judgment.  (Pl.'s Depo. at 17, 22.)  In addition, both plaintiffs in Keenan and Carmen were

14   represented by counsel; here, plaintiff is proceeding pro se.  Finally, the Ninth Circuit has held

15   that a district court may grant summary judgment on the basis of the moving papers and 'such

16   other papers as may be on file and specifically referred to.'"  Martinez v. Stanford, 323 F.3d

17   1178, 1179 (9th Cir. 2003), quoting Carmen, 237 F.3d at 1031.  Thus, although the court is not

18   required to scour the record, the court is not prohibited from reviewing the record.  Once the court

19   becomes aware of a potential disputed material fact during resolution of a dispositive motion,

20   particularly where the plaintiff is proceeding without counsel and the alleged fact is based on his

21   testimony under oath, the court is unable to ignore it simply because the pro se party failed to

22   raise it in his opposition.  Defense counsel did not address plaintiff's deposition testimony

23   concerning the handcuffing in the original motion, and did not supply undisputed evidence to

24   refute the alleged fact in response to this court's further briefing order.  See Carmen, 237 F.3d at

25   1031 ("If given an opportunity, the movant might sometimes be able to show that the appearance

26   of a genuine issue of fact was illusory.")

27   ////

28   ////

1   In light of the above, the court finds that whether or not defendant placed handcuffs on

2   plaintiff prior to or after the use of force is a disputed issue of fact, and thus must rule anew on

3   defendant's motion for summary judgment.

4   Motion for Summary Judgment

5   Defendant Palomares filed a motion for summary judgment, plaintiff filed an unverified

6   statement in opposition, and defendant filed a reply.  As set forth more fully below, the court

7   recommends that defendant's motion for summary judgment be granted.

8   Defendant's Motion

9   Defendant moves for summary judgment on the grounds that defendant used only the

10   force necessary to restore discipline and maintain order after plaintiff failed to obey multiple

11   direct orders and plaintiff suffered only de minimis injuries; to the extent that plaintiff claims

12   defendant's orders were unlawful, plaintiff's claim is barred by Heck v. Humphrey, 512 U.S. 477

13   (1994), and Edwards v. Balisok, 520 U.S. 641 (1997); and defendant is entitled to qualified

14   immunity because he did not violate plaintiff's constitutional rights, and a reasonable officer

15   would have believed defendant's actions to be lawful.

16   A.  Legal Standard for Summary Judgment

17   Summary judgment is appropriate when it is demonstrated that the standard set forth in

18   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

19   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

20   judgment as a matter of law." Fed. R. Civ. P. 56(a).[9]

21

22   > Under summary judgment practice, the moving party always
    > bears the initial responsibility of informing the district court of the
23   > basis for its motion, and identifying those portions of "the
    > pleadings, depositions, answers to interrogatories, and admissions
    > on file, together with the affidavits, if any," which it believes
24   > demonstrate the absence of a genuine issue of material fact.

25   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).

26

27   _____
    [9]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.
    However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he
28   standard for granting summary judgment remains unchanged."

1   "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove

2   that there is an absence of evidence to support the non-moving party's case."  Nursing Home

3   Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th

4   Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

5   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

6   burden of production may rely on a showing that a party who does have the trial burden cannot

7   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

8   should be entered, after adequate time for discovery and upon motion, against a party who fails to

9   make a showing sufficient to establish the existence of an element essential to that party's case,

10  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

11  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

12  necessarily renders all other facts immaterial."  Id. at 323.

13          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

14  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

15  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

16  establish the existence of such a factual dispute, the opposing party may not rely upon the

17  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

18  form of affidavits, and/or admissible discovery material in support of its contention that such a

19  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

20  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

21  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

22  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

23  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

24  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

25  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

26  1564, 1575 (9th Cir. 1990).

27          In the endeavor to establish the existence of a factual dispute, the opposing party need not

28  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

1   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

2   trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

3   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

4   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

5   amendments).

6          In resolving a summary judgment motion, the court examines the pleadings, depositions,

7   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

8   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

9   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

10  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

11  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

12  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

13  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

14  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

15  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

16  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

17  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

18         By contemporaneous notice provided on April 4, 2013, plaintiff was advised of the

19  requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

20  Procedure.  (ECF No. 30-1); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

21  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

22         B.  Undisputed Facts

23         For purposes of the instant motion for summary judgment, the court finds the following

24  facts undisputed, unless otherwise indicated:

25         1.  At all relevant times, plaintiff was in the custody of the CDCR at Mule Creek State

26  Prison ("MCSP").

27         2.  At all relevant times, defendant Palomares was employed by CDCR as an Institutional

28  Gang Investigator.

3. On June 18, 2010, at approximately 11:45 p.m., inmates in Building 11, Facility C were evacuated due to an inmate death.

4. Defendant Palomares reported to work to assist in the investigation.

5. At approximately 11:45 p.m., defendant began to conduct brief interviews with inmates outside the door of Building 11.

6. Once the interview was completed, inmates were instructed to sit on the basketball court in front of Building 11.

7. On June 19, 2010, at approximately 1:00 a.m., the inmates sitting on the basketball court began to complain.  Defendant contends plaintiff was the loudest in voicing displeasure; plaintiff contends he was not the loudest, but was the closest inmate to defendant.

8. Defendant declares he issued plaintiff at least two verbal orders to be quiet so defendant could focus on the investigation.  (ECF No. 30-5 at 14.)  Plaintiff declares defendant didn't tell plaintiff to be quiet -- defendant told plaintiff to "shut the fuck up."  (ECF No. 1 at 6.)

9. When defendant ordered plaintiff to stop instigating, plaintiff escalated his protests, stating, "This is bullshit, we're not staying out here until you finish asking these stupid ass questions."

10. Defendant removed plaintiff from the basketball court and isolated him about thirty yards away.

11. Defendant advised plaintiff that it would be another two hours before the inmates would be allowed to enter the building.

12. Plaintiff responded by again voicing his displeasure again, stating: "I guarantee you I won't be out here that long. I'm not a betting man, but I'm willing to bet that I won't be out here that long."

13. Defendant gave plaintiff a direct order to quiet down and to stop inciting.  Plaintiff responded by stating:  "I'm not going to stop talking.  I have my First Amendment rights and if you guys had done your fucking jobs we wouldn't be out here."

14. Defendant instructed plaintiff to lie prone on the ground and to place his hands on his back.  Plaintiff did not prone out.

14

15.  Defendant approached plaintiff, who was in a seated position, and placed his left hand on plaintiff's left elbow and his right hand on plaintiff's right shoulder.

16.  Defendant then used physical force to bring plaintiff to the ground.  Defendant pulled plaintiff's left arm back and pushed his upper torso to force plaintiff into a prone position.

17.  As plaintiff went to the ground, defendant heard a sound that he believed was plaintiff's head hitting the ground.

18.  At some point during this incident, defendant handcuffed plaintiff. [10]

19.  Once plaintiff was restrained, defendant called Sergeant Moeckly to respond to his location.  When Sergeant Moeckly arrived, defendant relinquished custody of plaintiff to Moeckly and resumed inmate interviews.

20.  As a member of the Investigative Services Unit, defendant does not generally have access to inmate medical records.  Defendant never reviewed plaintiff's medical records.

21.  At the time of the incident at issue, plaintiff did not have a medical chrono excusing him from orders to prone out.   (Pl.'s Depo at 31-2.)

22.  During the relevant period, plaintiff did not have a vest indicating he could not lay prone.[11]  (Pl.'s Depo at 31-32.)

23.  Plaintiff declares that he told defendant that plaintiff has a heart defibrillator and "tried to explain that [plaintiff] couldn't prone out because of the pressure it would place on [plaintiff's] heart device."  (ECF No. 1 at 43.)  Defendant declares that he was not aware that plaintiff had any medical condition that would prevent defendant from bringing plaintiff to the ground (ECF No. 30-5 at 15).

////

---

[10]  Plaintiff contends he was handcuffed prior to defendant's use of force.  Defendant contends that once plaintiff was on the ground, defendant ordered plaintiff to place his hands behind his back, and that plaintiff complied and defendant applied handcuffs.  (Defendant's fact 19 is renumbered as fact 18 here.)

[11]  However, plaintiff stated that even if he had been issued a vest, he would not have been allowed to wear it, as inmates were not allowed to bring anything with them during the evacuation.  (Pl.'s Depo at 32.)

24.  On July 23, 2010, plaintiff appeared before a senior hearing officer for a disciplinary hearing for a rules violation charging plaintiff with refusing a direct order resulting in the use of force (physical).

25.  Plaintiff pled not guilty to the charge.

26.  At the hearing, plaintiff was allowed to make a statement, and to ask questions of defendant through the hearing officer.  (ECF No. 1 at 6.)  The Rules Violation Report ("RVR") reflects that plaintiff was allowed to ask questions of his witness, inmate Ortiz, through the hearing officer.  (ECF No. 1 at 44.)  Plaintiff's request to call inmate witnesses Sandoval, Pinnick, Caraves, Salas, Suarez, and Zapien was denied, but the hearing officer noted that these inmates were sitting in the same group as Ortiz.  (ECF No. 1 at 44.)  The hearing officer noted that plaintiff had the same questions and anticipated similar responses, and conceded their testimony.  (Id.)

27.  Plaintiff was found guilty of the charged offense and assessed a thirty-day loss of behavioral credits.

28.  Plaintiff did not file a writ of habeas corpus and the guilty finding has not been overturned.  (Pl.'s Depo. at 55.)

29.  Plaintiff claims that he did not refuse to obey defendant's order because he had a doctor's note stating that he could not lie prone for medical reasons.  Plaintiff made a similar statement in the RVR.  Plaintiff stated, "I didn't disobey any orders.  I obeyed the order to strip out.  I obeyed the order to go outside.  I answered their questions.  I obeyed the order to sit on the basketball court.  I obeyed the order to move."  (Pl.'s Depo. 30:5-12; ECF No. 1 at 6, 43.)

30.  Plaintiff had an automated implantable cardioverter defibrillator ("AICD") implanted in February 2006.

31.  If an inmate has a physical limitation due to a medical condition, medical staff would complete a medical chrono documenting that condition and limitation. The Inmate Medical Procedures and Policies specify that if an inmate cannot lie in a prone position, this limitation shall be indicated on a CDCR Form 7410, Comprehensive Accommodation Chrono.  Copies of the CDCR Form 7410 are filed in the inmate's Unit Health Record, placed in his Central File,

1 given to the inmate, provided to the inmate's housing unit, provided to the assigned correctional

2 counselor, and provided to the Inmate Assignment Office.

3      32.  Following the implant of the AICD, on February 24, 2006, the only recommended

4 limitations were that plaintiff not engage in strenuous activity for 7 to 10 days and that he not

5 swim, lift weights, or golf for 3 months.  (ECF No. 30-5 at 27.)  On March 8, 2006, Dr. Srivatsa,

6 who implanted the AICD, advised that plaintiff should not play contact sports.  (ECF No. 30-5 at

7 33.)

8      33.  There is no medical reason that a patient with an AICD could not lie on their stomach

9 on the ground.[12]  (ECF No. 30-5 at 19.)

10      34.  A direct blow to the chest near an AICD may affect its functioning.  However, there is

11 no medical evidence that Grant's AICD was damaged or not functioning properly after the

12 incident with defendant on June 19, 2010.

13      35.  Plaintiff's medical records show that he was seen by Physician Assistant Richard

14 Kubota on June 30, 2010.  (ECF No. 30-5 at 24-25.)  Kubota, interpreting tests performed by

15 Senior Pacer Technician Barnes, noted that Grant's AICD was functioning normally.  (ECF Nos.

16 30-5 at 24-25; 29.)

17      36.  Kubota also noted that tests of plaintiff's AICD showed much improvement since his

18 last appointment.  (ECF No. 30-5 at 24.)

19      37.  Dr. Heatley declares that "[h]ad the terminals on [plaintiff's] AICD been damaged on

20 June 19, 2010, . . . the tests performed on June 30, 2010, would have shown that the AICD was

21 not functioning normally."  (ECF No. 30-5 at 19.)

22      38.  The medical report of injury completed on June 19, 2010, following the incident

23 herein, reflects that plaintiff suffered abrasions/scratches to his head and arm.  (ECF No. 30-6 at

24

---

25 [12]  In his statement of undisputed facts, plaintiff contends that the declaration of S. Heatley, M.D., Chief Medical Executive at MCSP, "was prepared without impartial and independent expert
26 opinion, but was prepared for [defendant] by CDCR employees and/or by personnel contracted to collaborate with [defendant].  (ECF No. 37 at 4-5.)  However, plaintiff cites to no evidence to
27 support his statement, and failed to provide medical records or evidence to refute Dr. Heatley's declaration.

28

21.)  No other injuries are noted on this form.  Plaintiff's medical records show that there was no

damage to his AICD as of June 30, 2010.[13]

     39.  On September 15, 2011, plaintiff was admitted to the San Joaquin General Hospital to

have his AICD generator and RV lead replaced.

     40.  Plaintiff's medical records note that the lead had been recalled and was defective.[14]

     41.  Plaintiff's medical records also note that his AICD was nearing the Elective

Replacement Indicator ("ERI").

     42.  Subsequent follow-up visits showed that plaintiff's AICD was generally functioning

normally.[15]  (ECF Nos. 30-6 at 4-5; 15-16.)  Plaintiff's medical records note that plaintiff had

some firing of his defibrillator, which was usually associated with physical exertion.  (ECF No.

30-6 at 4; 15-16.)

     43.  A progress note dated March 21, 2012, states that x-rays taken earlier showed a

possible fractured lead.  (ECF No. 30-6 at 8.)  The progress note that plaintiff was taken to the

cath lab, and after visual inspection of the pacemaker, AICD and the leads, it was found that the

fractured lead was a lead that had been replaced but not removed.  (Id.)  The leads and the

pacemaker generator were all functioning normally.  (Id.)

////

////

---

[13]  In his statement of undisputed facts, plaintiff appears to claim that defendant damaged a lead
to the AICD.  (ECF No. 37 at 4.)  However, plaintiff submitted no medical evidence to support
this claim.  Plaintiff also claims that "breaking the human skin open and damaging a lead to an
internal medical device is severe in nature" (id.), but provides no medical evidence or legal
authority to support this statement.

[14]  For example, on September 24, 2012, Dr. Chien noted that plaintiff "had a generator change
and lead revision because of Sprint Fidelis lead which has high incidence of failure."  (ECF No.
30-6 at 4.)

[15]  In connection with undisputed facts 42 and 43, plaintiff again claims "this issue" was
"prepared without impartial and independent expert opinion, but was prepared for [defendant] by
CDCR employees and/or by personnel contracted to collaborate with [defendant]."  (ECF no. 37
at 5.)  However, the documents supporting these two undisputed facts are medical records from
plaintiff's medical file.  Plaintiff has submitted no contrary medical records or other evidence to
refute such facts.

C. Excessive Force Claim

The court turns now to plaintiff's claim that the force used by defendant during the June 19, 2010 incident was excessive.

i. Use of Force Standards

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S. 312, 319 (1986).  Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  Id.

What is needed to show unnecessary and wanton infliction of pain "varies according to the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Whitley, 475 U.S. at 320).  Deference is to be given to the quick decisions officers must make when responding to a confrontation with "riotous inmates."  Whitley, 475 U.S. at 320-22. A deferential standard applies even in the case of "a lesser disruption," so long as it is necessary for guards to use force to keep order.  Hudson, 503 U.S. at 6.  In the case of resistance, the determinative question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm."  Id. at 7.

It is well established that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley, i.e., whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson, 503 U.S. at 6-7.  A prisoner is not required to show a "significant injury" to establish that he suffered a sufficiently serious constitutional deprivation.  Id., 503 U.S. at 9-10.

The Ninth Circuit has relied on the Hudson factors in determining whether an officer's application of force was applied in a good faith effort to restore discipline.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  These factors are: 1) the extent of the injury suffered by an inmate; 2) the need for application of force; 3) the relationship between that need and the amount

19

1    of force used; 4) the threat reasonably perceived by the responsible officials; and 5) any efforts

2    made to temper the severity of a forceful response.  Id.  From these factors, inferences may be

3    drawn as to whether the use of force could plausibly have been thought necessary, or instead

4    evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a

5    knowing willingness that it occur.  "Equally relevant are such factors as the extent of the threat to

6    the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of

7    facts known to them, and any efforts made to temper the severity of a forceful response."

8    Whitley, 475 U.S. at 321.

9         Thus, there is no Eighth Amendment violation if "force was applied in a good-faith effort

10   to maintain or restore discipline."  Hudson, 503 U.S. at 7.  Courts accord wide-ranging deference

11   to prison administrators in the exercise of policies and practices that in their judgment are needed

12   to preserve internal security, safety and discipline.  Whitley, 475 U.S. at 322-23.  The infliction of

13   pain in the course of implementing prison security measures does not amount to cruel and unusual

14   punishment even though it may appear, in hindsight, the degree of force was unreasonable.  Id. at

15   319.  An allegation of cruel and unusual punishment should proceed to trial only if the evidence

16   supports a reliable inference that the prison official intended to inflict pain.  Id. at 322.

17        ii.  Analysis

18        Defendant seeks summary judgment on the grounds that (1) he acted in good faith to

19   restore order and maintain discipline, (2) he used only the force necessary to restrain plaintiff

20   after he refused a direct order, (3)  the evidence demonstrates that plaintiff only suffered de

21   minimis injury, and (4) plaintiff's medical condition did not prevent him from complying with

22   defendant's order to lie prone.

23        Despite being granted two extensions of time in which to file an opposition to defendant's

24   motion for summary judgment (ECF Nos. 33 & 36),[16] plaintiff did not file an opposition, or

25   points and authorities in opposition, and did not submit medical records or other evidence to

26   _____

27   [16]  In his motions for extension of time, plaintiff did not indicate he would seek to discover
     personnel records or internal affairs records, or that he would seek leave to amend the complaint
     to challenge the 2010 RVR.  Rather, plaintiff asked for additional time to research and respond to
28   defendant's motion for summary judgment.  (ECF Nos. 32; 35.)

1   support his claim.  Rather, plaintiff filed a five page document styled, "Plaintiff's Statement of

2   Undisputed Facts and Deny Those Facts That [Are] Disputed," and a 21 page document styled,

3   "Points and Authorities in Support of Motion for Discovery of Correctional Officers' Files and

4   Records."  (ECF No. 37.)  In these unverified filings, plaintiff did not substantively address

5   defendant's arguments in support of the motion for summary judgment.  (Id., *passim*.)

6       Moreover, plaintiff did not submit his own declaration.  Despite plaintiff's reference to

7   numerous witnesses to the use of force incident, plaintiff provided no declarations or affidavits

8   from such witnesses.

9       However, plaintiff was a percipient witness to the events at issue here.  Therefore, the

10  court addressed plaintiff's issues with defendant's statement of undisputed facts, as set forth

11  above, and now considers plaintiff's verified complaint, attached exhibits, and his deposition in

12  addressing defendant's motion.

13          a.   Extent of Injury

14      In his verified complaint, plaintiff claimed defendant caused plaintiff to suffer "facial

15  scraping and bruising," along with damage to the heart device implanted in his chest, including

16  causing the terminals to dislodge from the device.  (ECF No. 1 at 8.)  However, the medical

17  records submitted by defendant reflect that plaintiff sustained an abrasion or scratch to his head

18  and arm, but no other injuries.  Plaintiff submitted no medical evidence to support his claim that

19  he sustained damage to his AICD or to the lead to the AICD, or to refute defendant's evidence

20  that plaintiff's lead was subsequently replaced because it was defective and subject to recall.

21  Plaintiff submitted no medical evidence to refute defendant's evidence that plaintiff's AICD was

22  working properly on June 30, 2010, or to rebut Dr. Heatley's opinion that had plaintiff's AICD

23  terminals been damaged on June 19, 2010, the AICD would not have been working properly on

24  June 30, 2010.

25          b.   Need for Force

26      It is undisputed that plaintiff was verbally expressing his displeasure, along with other

27  inmates, while evacuated to the yard on the night of June 18, 2010.  Plaintiff does not dispute that

28  he was removed from the group of inmates to the center of the basketball court (Pl.'s Depo. at

21

18.)  Plaintiff does not dispute that he did not stop verbally complaining or prone out when ordered to do so by defendant, although plaintiff does not characterize his failure to prone out as a refusal to obey defendant's order.

At the RVR hearing, defendant denied plaintiff said anything about a defibrillator, and in response to plaintiff's question, "Did I tell you I couldn't lay on my stomach but I could lay on my side?" defendant responded:  "No.  I think you said something like, I can't."  (ECF No. 1 at 6.)  However, even if plaintiff told defendant that plaintiff had a defibrillator, plaintiff adduced no evidence demonstrating that having a defibrillator precluded him from lying on his stomach. Despite plaintiff's claim that he had a doctor's note stating he could not lie prone for medical reasons (Undisputed Fact 29; Pl.'s Depo. at 30), plaintiff submitted no such medical record.[17] Plaintiff concedes that he did not have a chrono excusing him from having to prone out.  (Pl.'s Depo. at 26.)  Moreover, Dr. Heatley declared that there is no medical reason that a patient with an AICD could not lie on his stomach on the ground.  (ECF No. 30-5 at 19.)  Plaintiff adduced no evidence to the contrary.  Thus, even assuming plaintiff informed defendant about the defibrillator, plaintiff was not excused from complying with defendant's order.

Therefore, the undisputed facts indicate defendant was reacting to a situation created by plaintiff, who concedes that he was verbally expressing displeasure, that he did not stop complaining when defendant allegedly told him to "shut the fuck up," and that he engaged in an argument with defendant.  It is undisputed that even when plaintiff was removed to an area away from other inmates on the basketball court, he continued to refuse to follow defendant's orders. Plaintiff has failed to rebut defendant's evidence demonstrating there was a need for the use of force.

////

////

---

[17]  However, even if plaintiff had submitted such a medical record, plaintiff failed to adduce evidence refuting defendant's declaration that he does not generally have access to inmate medical records, that he has never reviewed plaintiff's medical records, and that at the time of the incident, he was not aware plaintiff had any medical condition that would prevent defendant from taking plaintiff to the ground (ECF No. 30-5 at 15).

c.  Threat Reasonably Perceived by Defendant

It is undisputed that defendant reported to Facility C at 11:30 p.m. on June 18, 2010, to assist in the investigation into an inmate's death.  Defendant was conducting interviews with inmates as they were evacuated from the building, and once interviewed, inmates were directed to sit on the basketball court.  Because of plaintiff's "loud and disruptive" vocal complaints, defendant became worried about plaintiff "possibly inciting the other inmates on the basketball court."  (ECF No. 30-5 at 14.)  Defendant first removed plaintiff from the basketball court "in an attempt to maintain institutional security and safety."  (ECF No. 30-5 at 14.)  Defendant declared that he gave plaintiff a direct order to lie prone on the ground, and plaintiff did not comply.  (ECF No. 30-5 at 15.)  After defendant placed his hands on plaintiff, defendant again ordered plaintiff to lay prone, but plaintiff did not comply.  (Id.)  Moreover, defendant declared that:

> In the correctional setting inmates greatly outnumber correctional officers and staff.  For this reason, it is imperative for correctional officers to maintain order and discipline.  If order and discipline are threatened by an inmate's behavior, correctional officers must act immediately to end that behavior before it escalates out of control.

(ECF No. 30-15 at 14.)  Plaintiff adduced no evidence contradicting defendant's security concerns.  Indeed, plaintiff confirmed that there were several dozen inmates on the basketball court.  (ECF No. 1 at 5.)

Defendant was assigned to interview inmates in connection with an inmate's death, and it appears that plaintiff's refusal to follow defendant's orders interfered with defendant's ability to continue interviewing inmates, thus delaying the investigation.  Specifically, plaintiff's undisputed continued refusal to follow defendant's orders posed a significant threat that plaintiff's actions would escalate the situation, putting at risk correctional officers who were outnumbered by inmates.

d.  Effort to Temper the Severity of Force

It is undisputed that defendant first attempted to get plaintiff to quiet down before he removed plaintiff from the group of inmates.  Plaintiff concedes that he argued with defendant. Defendant further attempted to temper the severity of a forceful response by ordering plaintiff to lie prone before resorting to the use of force.  It is undisputed that plaintiff refused to lie prone.

23

1        e.    Relationship Between Need for Force and Force Used

2               It is undisputed that plaintiff was brought to the ground from a seated position.  In his

3     verified complaint, plaintiff claims that defendant "body slammed" plaintiff.  In his deposition,

4     plaintiff testified that defendant "slammed" plaintiff on his "face and chest," and onto "the

5     ground."  (Pl.'s Depo at 15, 17.)  Plaintiff testified that defendant was behind him when defendant

6     took plaintiff to the ground.  (Pl.'s Depo. at 42.)  However, in his statement of undisputed facts,

7     plaintiff does not dispute that defendant pulled plaintiff's left arm back and pushed plaintiff's

8     upper torso to force plaintiff into a prone position.  (ECF No. 37 at 1-2.)[18]  Plaintiff did not

9     further dispute these facts in his supplemental response.  (ECF No. 41.)

10              Moreover, in his discovery motion, plaintiff again confirms that defendant placed his right

11    hand on plaintiff's right shoulder, and then placed his left hand on plaintiff's left elbow.  (Id.)

12    Plaintiff then states that defendant, "in a malicious[] and sadistic[] manner[,] applied severe brutal

13    physical force pulling plaintiff's left elbow back while at the same time pushing plaintiff's upper

14    torso forward moving plaintiff from his attempted laying on his right side to a prone position in

15    [a] matter of a fraction of a second."  (ECF No. 37 at 11.)  Despite plaintiff's new and unverified

16    claim that defendant used force in a malicious and sadistic manner, plaintiff also concedes it was

17    a very brief use of force.

18              At his deposition, plaintiff testified that he was handcuffed before defendant used force;

19    defendant declared he handcuffed plaintiff after plaintiff was prone on the ground.  Specifically,

20    when asked to describe how he was taken down, plaintiff testified as follows:

21                      . . . from exactly how everything happened, no, I can't.  The only
                   thing I can tell you that I do remember is I was seated Indian style, I
22                 was asked to lay prone.  I explained to Officer Palomares that I
                   could not lay prone so he asked me, I remember this part, he asked
23                 me to give him one of my arms so I did as I was sitting down, he
                   took one of my arms, cuffed me, he took my other arm, cuffed me
24                 and then he slammed me on the ground.   That's what I do
                   remember.
25    ─────────────────────
26    [18]  In the statement of facts portion of plaintiff's unverified discovery motion, plaintiff now
      claims he tried to comply with defendant's prone out order by attempting to lay on his right side.
27    (ECF No. 37 at 11.)  However, in his verified complaint, and at the RVR hearing, plaintiff stated
      that he "just told" defendant that plaintiff could lay on his side but not his stomach.  (ECF No. 1
28    at 6.)

1   (Pl.'s Depo. at 22.)  This testimony supports plaintiff's description of the use of force occurring in

2   a "fraction of a second."  (ECF No. 37 at 11.)

3   　　　It is undisputed that plaintiff was forced to the ground from a seated position and hit his

4   head.  However, it also appears undisputed that the use of force was very brief.  Moreover, it is

5   undisputed that the use of force was accomplished by pulling plaintiff's left elbow back while at

6   the same time pushing plaintiff's upper torso forward.  While handcuffing plaintiff prior to

7   bringing him to the ground might be more force than necessary, the undisputed facts do not

8   support a finding that the use of force was excessive under the circumstances.

9   　　　f.　Conclusion

10   　　　"Unreasonable force claims are generally questions of fact for a jury."  Hervey v. Estes,

11   65 F3d 784, 791 (9th Cir. 1995).  However, here, viewing the evidence in the light most favorable

12   to plaintiff, there is no question of fact as to the extent of plaintiff's injuries, the need for the

13   application of force, whether the threat was reasonably perceived by defendant, or whether

14   defendant tempered the severity of force.  Plaintiff failed to raise a genuine dispute of material

15   fact as to whether defendant acted "maliciously or sadistically" for the purpose of causing him

16   harm, rather than with a good faith purpose to restore discipline.

17   　　　It is undisputed that defendant was acting to prevent an escalation in the midst of an

18   evacuation and investigation into the death of an inmate.  The record demonstrates that there was

19   a reasonably perceived threat that plaintiff might incite other inmates to act out, and the

20   undisputed facts reflect that plaintiff escalated the incident from verbally expressing his

21   displeasure to arguing with defendant, and continuing to refuse to comply with defendant's

22   orders.  Plaintiff provided no evidence to suggest the force was not applied in good faith to

23   maintain institutional security and safety.  Indeed, the record shows that defendant first attempted

24   to get plaintiff to quiet down and tried to temper the need for force by ordering plaintiff to lie

25   prone before resorting to the use of force.  The court must be deferential when force is

26   legitimately used to maintain or restore security and order.  See Whitley, 475 U.S. at 321-22; see

27   also Norwood v. Vance, 591 F.3d 1062, 1066-67 (9th Cir. 2010), cert. denied, 131 S. Ct. 1465

28   (2011).

1    Under the circumstances, plaintiff's bald assertion that he was handcuffed and "slammed"

2  to the ground is insufficient, without more, to create a genuine dispute of material fact that

3  defendant used excessive force under <u>Hudson</u>.  Similarly, plaintiff's unverified claim that

4  defendant's use of force was done in "a malicious[] and sadistic[] manner[,]" (ECF No. 37 at 11),

5  without more, fails to create a material dispute of fact.  Unlike in <u>Hudson</u>, defendant did not strike

6  blows at plaintiff's mouth, eyes, chest, and stomach.  Plaintiff adduced no evidence that

7  defendant used force simply to cause plaintiff harm rather than to bring plaintiff under control.

8  Construing the evidence submitted in the light most favorable to plaintiff, plaintiff has established

9  that in response to defendant's undisputed security concerns, during a very brief use of force,

10  defendant handcuffed plaintiff, pulled plaintiff's left elbow back while at the same time pushing

11  plaintiff's upper torso, and then forcefully "slammed" plaintiff into a prone position from a seated

12  position, causing an abrasion or scratch to plaintiff's face and arm.  Plaintiff's injuries support the

13  view that the force defendant used in response to his undisputed security concerns was not

14  excessive.  Applying the <u>Hudson</u> factors to the undisputed evidence, no reasonable jury could

15  conclude that the force defendant used was applied "maliciously and sadistically to cause harm"

16  as opposed to a good faith effort to maintain institutional security during an investigation into an

17  inmate's death, which took place in the middle of the night, requiring a large number of inmates

18  to be evacuated from their building.  <u>See</u> <u>Hudson</u>, 503 U.S. at 7.

19    Thus, plaintiff has failed to raise a triable issue of fact that defendant used excessive force

20  against him in violation of the Eighth Amendment.  <u>See</u>, <u>e.g.</u>, <u>Ackley v. Carroll</u>, 2011 WL

21  2160896, *7-8 (E.D. Cal. June 1, 2011) (pushing the plaintiff against a wall and kicking his leg

22  during pat down search was a de minimis use of force not actionable under the Eighth

23  Amendment); <u>Moore v. Machado</u>, 2009 WL 4051082, *5 (N.D. Cal. Nov. 20, 2009) (throwing

24  the plaintiff against a wall and bending or twisting his arm was a de minimis use of force not

25  actionable under the Eighth Amendment).

26    For all of these reasons, the court finds that plaintiff failed to refute defendant's evidence

27  that he applied force to maintain or restore discipline, and therefore defendant is entitled to

28  summary judgment.

Alternative Grounds

Because defendant is entitled to summary judgment, the court need not address defendant's alternative grounds for relief.

Conclusion

Accordingly, IT IS HEREBY ORDERED that:

1.   The January 8, 2014 findings and recommendations (ECF No. 42) are vacated;

2.   Plaintiff's application for extension of time (ECF No. 43) is denied; and

IT IS RECOMMENDED that defendant's motion for summary judgment (ECF No. 30) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 5, 2014

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/gran2302.msj2

27